NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar Number 13644
SUE FAHAMI
Nevada Bar Number 5634
400 South Virginia Street, Suite 900
Reno, NV 89501
PHONE: 775-784-5438
FAX: 775-784-5181
sue.p.fahami@usdoj.gov
*Representing the United States of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  vs.<br><br>DEVENDRA I. PATEL, M.D.,<br><br>  Defendant. | 3:17-CR-00114-LRH-CBC<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

Certification: This memorandum is timely.

**I. Introduction**

The sentencing hearing for defendant Devendra I. Patel ("Patel") is set for April 9, 2019. For the reasons set forth below, the government requests that the Court sentence Patel to no less than 37 months in prison followed by three years of supervised release.

**II.     Factual Background**

In July of 2017, the DEA Reno Resident Office and FBI Reno Office initiated a criminal investigation into Dr. Patel. Dr. Patel was known in and around Elko due to his illicit prescribing patterns in northeast Nevada. This investigation began in response to allegations

1

that Dr. Patel may have illicitly been prescribing narcotics not for a legitimate medical purpose and not in the usual course of professional practice.

A. **The Charged Conduct**

Dr. Patel's dangerous prescribing practices out of his clinic in Elko, were charged as distribution counts. An analysis of Dr. Patel's prescribing practices convincingly indicated that Dr. Patel prescribed at a high dosage rate to the majority of his patients, outside the course of professional practice. This was an easy way to make money and keep his patients coming back for billing purposes.

The government's retained medical expert, Dr. Timothy Munzing[1] reviewed the coroner report and medical files available and made the determination that Dr. Patel's prescriptions in this case were outside the usual course of professional practice and without a legitimate medical purpose. He stated unequivocally, that there was no medical necessity for prescriptions to the patients in the Indictment (ECF No. 2). Based on his reviews, Dr. Munzing expressed that in his opinion, to a reasonable degree of medical certainty, Dr. Patel prescribed controlled substances, outside the usual course of professional practice and without a legitimate medical purpose.

**1. Distribution to Patient A**

One such patient of Dr. Patel's was Patient A. He was a 35-year-old man. He suffered neck pain due to an old baseball injury. Between September 25, 2014, and February 12, 2016, Dr. Patel prescribed Schedule II & V controlled substances, Oxycodone and Promethazine

---

[1] Dr. Munzing has seen and managed thousands of patients for pain in his three decades of practice. He has been used as an expert throughout the country since 2014. He has 28 years experience as a residency director, responsible for ensuring the standards of care for residents, medical students, faculty, etc. Dr. Munzing was awarded with the 2017 California Academy of Family Physicians – Hero of Family Medicine Award.

(codeine syrup) to Patient A. On February 15, 2016, he was found in his bathroom due to an opioid overdose. His last visit with Dr. Patel was on February 12, 2016, when Dr. Patel noted his "chronic anger and emotional" issues and then prescribed him 75 Oxycodone HCL 10 mg tablets and terminated him as a patient. Dr. Patel's overall documentation was generally poor.

The Elko County Coroner's Report found that Patient A's cause of death was respiratory arrest / positional asphyxia and syncope (fainting). The Toxicology Report noted that Patient A had Alprazolam, Oxycodone and Oxymorphone in his system.

On February 15, 2016, his mother found Patient A in the morning. He was in the bathroom on the floor between the toilet and the wall face down. His eyes and forehead had signs of contusion. It appeared that he hit his head and jaw when he fell over. Patient A suffered from bipolar disease per his mental health provider. Five empty bottles of Oxycodone were found in his home. All five of the bottles were prescribed by Dr. Patel as indicated by the labels on the bottles. Patient A's mother said that he received a "new round of prescriptions" from Dr. Patel recently. He returned and was "angry and volatile." She attributed the mood change to the medications, or lack of medications. She checked on him the day of death and found him deceased. She felt Patient A committed suicide by overdosing.

After a medical file review, multiple areas of concern were identified by Dr. Munzing, leading him to believe that, in regards to Patient A, Dr. Patel's prescriptions were outside the usual course of professional practice and without a legitimate medical purpose. Dr. Patel's prescriptions to Patient A violated 21 U.S.C. § 841.

B.   **The Relevant Conduct**

Dr. Patel used his Nevada DEA License to prescribe controlled substances outside the usual course of professional practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and § 846 and 21 C.F.R. 1306.04(a).

Dr. Patel exhibited red flag indicators of opioid diversion and overprescribing. Dr. Patel prescribed highly addictive pain pills at a high dosage rate to his patients. This forced his patients to return for regular visits with Dr. Patel in order to receive another prescription to feed their addiction. This type of conduct by a doctor is referred to as "churning" a practice.

### III.   Rule 11 Plea Agreement and Sentencing Guideline Calculation

On November 26, 2018, Dr. Patel pleaded guilty to Count One of the Criminal Indictment, charging him with intent to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1). (ECF No. 28) Pursuant to a Rule 11 Plea Agreement, the parties agreed that the applicable guideline range for sentencing was 30-37 months, based on an Offense Level of 19 and a Criminal History Category of I. *Id.* at 7.  U.S. Probation determined a guidelines calculation of 21.  *See* PSR at ¶ 37.  For the purposes of guideline calculations only, the parties agreed to limit Dr. Patel's drug quantity to approximately 10,800 milligrams of Schedule II controlled substances, Hydrocodone/Oxycodone. (ECF No. 28 at 7)

### IV.   Application of 18 U.S.C. § 3553(a)

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a sentence that is "sufficient, but not greater than necessary."  Those objectives are:  (i) the nature and circumstances of the offense, and the history and characteristics of the defendant; (ii) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (iii) the kinds of sentences legally available; (iv) the Sentencing Guidelines; (v) Sentencing Commission policy statements; (vi) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (vii) the need for restitution.  The most relevant factors applicable to Patel are set forth below.

A. **Nature and Circumstances of the Offense, and the History and Characteristics of the Offender, 18 U.S.C. § 3553(a)(1)**

Drug trafficking is a very dangerous crime. *United States v. Stone*, 608 F.3d 939, 947, n. 6 (6th Cir. 2010) ("To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community."); *United States v. Leon*, 766 F.2d 77, 81 (2nd Cir. 1985) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'"). In 2016, there were 408 opioid-related deaths in Nevada, according to the Nevada Department of Health and Human Services. In 2016, Nevada's per capita prescription rate for opioids was 87/100 residents. Nevada ranked as the sixth highest state for the number of milligrams of opioids distributed per adult according to a DEA study. From 2010 to 2016, opioid-related hospitalizations have increased by 136% in emergency room encounters and 84% in in-patient admissions. During this time period, 85% of all opioid-related deaths in Nevada were deemed accidents. (National Institute on Drug Abuse Study for Nevada, February 2018)

In the instant case, Dr. Patel aided in the dangerous and illegal trafficking of prescription opioids. He engaged in this illegal endeavor knowingly and willingly. The defendant understood the potential consequences of his actions and made a conscious choice to accept those risks because the financial payout associated with this illegal activity was worth the risk. There is nothing to suggest that Dr. Patel would have changed his course of conduct in any way had he not been caught.

Dr. Patel was well aware of the red flags of opioid drug diversion and intentionally overlooked them in his practice. These brazen prescriptions were in direct violation of his duty as a licensed medical doctor, especially in an underserved region of northeast Nevada. There was no regard for the actual medical care that these patients needed. All of this is strong evidence that Dr. Patel's prescribing practices allowed him to prescribe opioids without

addressing any legitimate medical concerns. Consistent with the plea agreement, the government recommends a 37-month term of custody.

The below charts summarize the total relevant scripts prescribed by Dr. Patel during the timeframe of this scheme.

**Summary of Dr. Patel's Prescribing from September 2014 to September 2017**

Total prescriptions: 22,085          (average 613 per month)

Dosage units of prescriptions: 1,286,144    (average 58 per prescription)

**Prescriptions by General Drug Class**

| Drug Class | Number of Prescriptions |
|---|---|
| Narcotic | 8,167 |
| Sedative | 12,102 |
| Steroid | 516 |
| Stimulant | 2,113 |

**Narcotic / Opioid Prescriptions by Type**

| Narcotics (Opioids) | # Prescriptions |
|---|---|
| Fentanyl | 204 |
| Hydrocodone | 3,616 |
| Hydromorphone | 74 |
| Methadone | 82 |
| Morphine | 119 |
| Oxycodone | 2,881 |
| Tramadol | 922 |

Dr. Patel was a knowing, willing and essential participant. Patel's conduct in this case shows the type of defendant that has complete disregard for following the law and one that should face a significant custodial sentence.

**B. Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment, 18 U.S.C. § 3553(a)(2)(A)**

The recommended 37-month custodial sentence appropriately accounts for the seriousness of Dr. Patel's offense and justly punishes it. *See* 18 U.S.C. § 3553(a) (2)(A). Dr. Patel's illegal distribution of prescription drugs presented a serious danger that should not be trivialized. Opioid abuse is on the rise and tearing apart communities. According to the Center for Disease Control (CDC), more than 42,000 people died from a prescription opioid overdose in 2016 and over 1,000 people are treated in the emergency room daily for improper use of prescription opioids. (CDC October 2017.) Participation in a conduct that perpetuates this type of epidemic is serious and warrants punishment.

In order for the Court to provide just punishment, a significant custodial sentence is necessary. Dr. Patel, despite being a licensed medical provider, is nothing more than a drug dealer in a white coat. His status as a well-educated, white-collar offender does not warrant any leniency given the circumstances of this case. Dr. Patel was a trained medical professional – one with the power to positively affect the lives of his patients. He acted with a complete disregard to do no harm to his patients. He pushed countless pills into the hands of addicts and potential addicts and those that could ultimately sell the pills.

Dr. Patel's actions are not merely crimes committed on paper. Dr. Patel's reckless allowance of prescribing not only harmed his own patients, but his participation in this drug diversion scheme placed thousands of pills on the streets of Elko and the surrounding communities.

While some may argue that the opioid epidemic is a public health issue, it cannot be that alone. There must be a criminal justice approach to stop the source of these pills from hitting the streets and addicting our communities. There is no question that addicts have accountability in this epidemic. However, from a public health view, these addicts act without free choice because they are addicted. Medical doctors, on the other hand, have the distinct choice of placing these drugs in the hands of these sick individuals. Source doctors must be sent a strong and clear message that hiding behind their prescription pads and blaming the addicts for this epidemic will not be tolerated.

There has to be some accountability and punishment to right the wrong of the moral composition of this type of behavior. This doctor, with the stroke of a pen, literally fueled the addiction of people to opioids and led many down a path to ultimate demise. A custodial sentence of 37 months in this instance is what justice requires. It would reflect the seriousness of this offense, justly punish the abhorrent behavior of Dr. Patel and promote respect for the law.

**C.  To Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(B)-(C)**

A 37-month custodial sentence can provide specific and general deterrence for Patel's criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). Deterrence serves to discourage others who are inclined to involve themselves in similar criminal conduct. It is also an important consideration when fashioning a sentence that will persuade a defendant from continuing to engage in criminal behavior.

With respect to specific deterrence, a significant custodial sentence should deter Dr. Patel from engaging in further criminal conduct. Dr. Patel will likely argue that the eventual, future surrender of his medical license is punishment enough to deter future misconduct. Dr.

Patel did surrender his DEA license and is currently unable to prescribe controlled substances. However, addressing Dr. Patel's criminal conduct has to be more than a licensing issue.

His conduct is criminal and should be treated and punished as a crime so that he and other medical professionals do not think there is an easy way out. Losing a medical license will simply force doctors into more creative ways to distribute the medication so that they can continue to profit from the illegal conduct.

Importantly, a custodial sentence will also provide a clear message important to the goal of general deterrence. For Dr. Patel, a custodial sentence should specifically deter any chance of future criminal conduct. The sentence imposed for medical professionals involved in these opioid diversion cases must be capable of sending a strong message that the Court will not tolerate conduct contributing to an epidemic killing our communities. If general deterrence is to serve any aim – it has "value in the process of imposing punishment because it works to keep judges from succumbing to the impulse to see white-collar defendants in the warm light of a contrite individual who engaged in aberrational conduct but is unlikely to offend again."[2]

The justice system all too often treats white-collar defendants, like Dr. Patel, different from their counterparts, street drug dealers. The street dealers have been designated to have a higher chance at recidivism because their background suggests that they have nothing to lose, as opposed to the doctors that are supplying the drugs. Accomplished doctors, like Dr. Patel, have made conscious choices to act this way and throw away years of education and training. These doctors are not the victims, they are the perpetrators.

---

[2] Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 32 (2015).

Dr. Patel, like so many other doctors, has decided that the potential financial gain is more important than the lives of the patients that he was tasked to treat. He placed more value in making money than the lives of those that will ultimately end up addicted to these opioids because he pushed them on the streets. A custodial sentence should significantly contribute to deterring him from prescribing opioids for monetary gain. The sentence imposed must reinforce to the medical community that this conduct will not be tolerated and those choosing to engage in this conduct will be held accountable.

A custodial sentence also protects the public from the future harm that Dr. Patel may cause. Allowing this doctor on the streets to continue prescribing will certainly endanger the community. A custodial sentence is necessary to protect the public from the reckless disregard that Dr. Patel has for their health and well-being.

**D.    To Avoid Unwarranted Sentencing Disparities, 18 U.S.C. § 3553(a)(4)**

There are differing views on whether the need to avoid unwarranted sentencing disparities should be evaluated on a case specific level or a national/local level. On a national level, courts have sentenced doctors involved in drug diversion conspiracies to substantial custodial sentences. *See e.g. United States v. Dr. Michael Kostenko*, 16-cr-221 (S.D.WV) (240 months for unlawful distribution of Oxycodone); *United States v. Dr. Michael Dietch*, 16-cr-123 (M.D.FL) (135 months for distributing oxycodone); *United States v. Dr. Edward Feldman*, 14-cr-521 (M.D.FL) (300 months for distribution of Oxycodone); *United States v. Dr. Fred Turner and Dr. Rosetta Cannata*, 15-cr-264 (M.D.FL) (both doctors sentenced to 151 months for distribution of Morphine, Hydrocodone and Oxycodone), and *United States v. Capos, Jr.*, 14-cr-20 (E.D.CA) (52 months for distribution of Oxycodone).

Moreover, in this district, medical professionals who have been convicted of unlawfully prescribing controlled substances without a legitimate medical purpose have also received

custodial sentences. Of note in 2016, in the *Unites States v. Dr. Henri Wetselaar*, 11-cr-347 (D.NV) he was sentenced to 120 months for distribution of Oxycodone. Other doctors have been sentenced to custodial sentences including, Dr. Horace P. Guerra in *United States v. Horace P. Guerra*, 2:18-cr-00197 (D.NV), who on October 25, 2018 was sentenced by the Honorable James Mahan to a 12 month and one day custodial sentence for his role in the distribution conspiracy, in which he pleaded guilty to a criminal information for a total offense level of 12. In September 2015, Dr. Paulin was sentenced to 24 months on Distribution and Structuring charges. In July 2014, Dr. Bruce was sentenced to 46 months on Conspiracy to Distribute charges. In October 2015, Dr. Kuthuru was sentenced to 28 months on Distribution charges. In October 2011, Dr. Tindall was sentenced to 24 months on Distribution charges.  In December 2013, Dr. Bararia was sentenced to 44 months on Distribution charges.  All of these defendants were licensed professionals in Nevada that violated their oath to do no harm, betrayed the trust of and injured the community.  Patel's conduct is similarly situated. Imposing the requested 37-month custodial sentence will avoid unwarranted sentencing disparities.

### V. Conclusion

For the foregoing reasons, the Government respectfully requests that the Court sentence Dr. Patel to **37 months imprisonment**.

DATED this 1st day of April, 2019.

Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

 /s/  Sue P. Fahami
SUE P. FAHAMI
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I certify that the following individual was served with a copy of the GOVERNMENT'S SENTENCING MEMORANDUM on this date by the below identified method of service:

**Electronic Case Filing**
Mr. Lance Maningo
400 South 4th Street, Ste. 650
Las Vegas, Nevada 89101
Attorney for Defendant – Dr. Devendra Patel
lance@maningolaw.com

DATED:     April 1, 2019            _____/s/ Sue P. Fahami_____
                                     Assistant United States Attorney